JS-6   O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| T-MOBILE WEST CORPORATION, a Delaware corporation, | Case No. **CV 10-2835 CAS (Ex)** |
| Plaintiff, | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| vs. | Before the Honorable Christina A. Snyder |
| CITY OF HUNTINGTON BEACH, a public entity organized and existing under the laws of the State of California; CITY COUNCIL OF THE CITY OF HUNTINGTON BEACH, | Trial Date:  August 28, 2012<br>Time:  9:30 a.m.<br>Courtroom:  5 |
| Defendants. | |

## <u>FINDINGS OF FACT</u>

This case was tried to the Court on August 28, 29, 30 and 31, 2012.  Martin Fineman of Davis Wright Tremaine LLP appeared for plaintiff T-Mobile West Corporation.  Scott F. Field, Assistant City Attorney for the City of Huntington Beach, appeared for defendants.

The Court finds the following facts are supported by the evidence.

1.      Plaintiff T-Mobile West Corporation ("T-Mobile") is a Delaware corporation with its principal place of business in Bellevue, Washington.

2.      Plaintiff T-Mobile is the operating entity of T-Mobile USA, Inc. in the Southern California market and, as such, uses Federal Communications Commission licenses held by related T-Mobile entities to provide commercial mobile radio services ("CMRS") within the Southern California area.  Thus, Plaintiff T-Mobile West Corporation provides personal and advanced wireless services, and therefore operates commercial mobile radio services, as defined by federal law, and markets them in Southern California under the name "T-Mobile."

3.      Defendant City of Huntington Beach is a public entity organized and existing under the laws of the State of California.

4.      Defendant City Council of the City of Huntington Beach ("City Council") is the governing body of the City of Huntington Beach.

5.      The City of Huntington Beach and the City Council are collectively referred to herein as the "City".

**Jurisdiction and Venue**

6.      The Court has jurisdiction over the action pursuant to 28 U.S.C. §§ 1331 (federal question) and 1337 (commerce) based on the alleged violation of 47 U.S.C. § 332(c)(7)(B)(i)(II).

7.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because Defendants reside in this judicial district and because a significant part of the events or omissions giving rise to the claims herein occurred in this judicial district.

**History**

8.      On April 20, 2009, T-Mobile applied for a Wireless Permit (No. 09-013) to install and operate a wireless telecommunications facility ("Facility") that would fill a significant gap in coverage in T-Mobile's network in the area around Edwards and Heil in Huntington Beach.

/ / /

9.     The Facility would be located on the property of Community United Methodist Church, 6666 Heil Avenue, Huntington Beach, California ("CUMC," "Community United" or "the Church").

10.    When it first applied for a wireless permit for a wireless telecommunications facility at CUMC, T-Mobile proposed a 55 foot tall faux palm tree, commonly referred to as a "monopalm," to support and conceal the antennas. There were to be 12 panel antennas plus one GPS antenna and radio equipment within a block wall enclosure.

11.    On May 12, 2009, the City issued its Initial Action for the project, approving the Wireless Permit with the requirement to obtain a Conditional Use Permit ("CUP") and undergo Design Review.

12.    T-Mobile filed a comprehensive application for a CUP that addressed the significant gap in service in the area surrounding CUMC, as well as an analysis of CUMC and potential alternate locations.

13.    On August 24, 2009, the City deemed the T-Mobile application complete. The City scheduled the Design Review Board review for September 10, 2009 and the City's Zoning Administrator hearing on the CUP application for September 30, 2009.

14.    On September 10, 2009, the City's Design Review Board recommended approval of the project, with conditions, to the Zoning Administrator.

15.    On September 24, 2009, T-Mobile held a Neighborhood Meeting at CUMC to explain the project to any interested members of the public.

16.    The City's Zoning Administrator is the City official authorized to hear and decide upon Wireless Permits and Conditional Use Permits.  Absent an appeal, the Zoning Administrator's decision on such applications is final.

17.    The Zoning Administrator heard the case on September 30, 2009, and continued the item to October 28, 2009, to allow for alternative design options to be developed. The hearing was later continued to November 4, 2009, to allow additional time for design exhibits to be developed.

18.     The Zoning Administrator and the Planning Department asked T-Mobile to change the proposed design of the Facility from the monopalm design to a bell tower design.  T-Mobile complied.  The monopalm design would have required a new vertical element while the bell tower design would not.  The bell tower design called for the replacement of an existing 52 foot bell tower at CUMC with a new 55 foot bell tower of essentially identical design.  The new bell tower was designed such that it was completed stealthed – that is, the antennas would be enclosed within the tower and could not be seen.  The panels at the top of the proposed bell tower were designed to replicate the design of the façade of the Church.  The radio equipment would be placed underground and also could not be seen.  The number of panel antennas would be reduced from 12 with the monopalm design to 6 with the bell tower design.

19.     The staff report recommended approval of the CUP.

20.     On November 4, 2009, the City's Zoning Administrator heard the case and approved the project as a fifty-five (55) foot tall replacement bell tower.  The City's Notice of Action letter with conditions of approval was issued the same day, with the appeal period ending November 16, 2009.

21.     The Zoning Administrator made the following findings on the basis of the evidence in the record:

Zoning Administrator Finding 1: The Facility will not be detrimental to the general welfare of persons working or residing in the vicinity or detrimental to the value of the property and improvements in the neighborhood.  Also, the project will not generate noise, traffic, or demand for additional parking beyond that already exists on the subject site.

Zoning Administrator Finding 2: The Facility will be compatible with surrounding uses because the ancillary equipment is underground, and the replacement bell tower will blend into the surrounding environment, including the existing church on the site, while completely concealing the antennas from public view.

/ / /

Zoning Administrator Finding 3: The CUP will comply with the provisions of the base zoning district and other applicable provisions in Titles 20-25 of the Huntington Beach Zoning and Subdivision Ordinance. Wireless facilities may exceed the 35 foot height limitation for the base zoning district with approval of a CUP.

Zoning Administrator Finding 4: Granting the CUP will not adversely affect the General Plan because it is consistent with the "Public" Land Use Element designation on the subject church property.  The Facility will enhance wireless communications in the community by improving the signal transmission and reception in the project vicinity.  As conditioned, the Facility will have minimal visual impacts to surrounding uses "because the wireless communications equipment will be underground and the new bell tower will match the existing [bell tower]."  In addition, the CUP is consistent with the relevant goals and policies in the Land Use Element and Utility Element in the Huntington Beach General Plan.  Specifically:

Land Use Element Goal LU 2: Ensure that development is adequately served by transportation infrastructure, utility infrastructure, and public services.

Land Use Element Policy LU 2.1.1: Plan and construct public infrastructure and service improvements as demand necessitates to support the land uses specified in the Land Use Plan (as defined in the Circulation and Public Utilities and Services Elements of the General Plan).

Utility Element Policy U 5.1: Ensure that adequate natural gas, telecommunication and electrical systems are provided.

Utility Element Policy U 5.1.1: Continue to work with service providers to maintain current levels of service and facilitate improved levels of service.

CEQA Exemption: The Zoning Administrator also found that the project will not have any significant effect on the environment and is exempt from the requirements of the California Environmental Quality Act ("CEQA") pursuant to section 15301 of the CEQA Guidelines (i.e., section 15301 of Title 14 of the California Code of Regulations).

22.     The Zoning Administrator's action was appealed by Ms. Dianne Larson, a member of the public, on November 16, 2009.

23.     T-Mobile held a second Neighborhood Meeting for the project on December 9, 2009 at CUMC.

24.     On January 12, 2010, the Planning Commission held a study session on the project.

25.     The staff report recommended approval of the CUP application.

26.     On January 26, 2010, the Planning Commission granted the appeal and denied the CUP.

27.     On February 5, 2010, T-Mobile filed an appeal of the Planning Commission action to the City Council.

28.     The City Staff submitted a Staff Report recommending approval of the CUP.  In summary, City Staff found:  "[T]he distance between existing cell sites creates a coverage gap and limits the signal strength to a point where indoor coverage is reduced or nonexistent."  "[T]he proposed facility will improve network performance by increasing the signal strength."  "Staff determined that the information submitted demonstrated that a sufficient gap in coverage."  "Staff evaluated the alternatives and determined that the proposed location and design as the least obtrusive location feasible so as to eliminate any gap in coverage."  "The design is completely stealth due to the fact that the proposed design is integrated into the church facility by replicating an on-site structure in a manner that it cannot be identified as a wireless communications facility."

29.     On March 15, 2010, the City Council denied the T-Mobile appeal and upheld the Planning Commission's decision of denial of the CUP.

30.     The City Council's Notice of Action states:  "[T]here are incomplete and inconsistent facts regarding whether the project is necessary to fill a significant gap in wireless coverage."  "[T]here was no evidence presented that alternative sites were analyzed and considered as available to remediate any significant gap in coverage

issues in the area."  "[T]he proposed wireless communications facility . . . will intrude into the views of adjacent residents."  "The proposed design of the new bell tower will create visual blight . . ."  "Masked in the existing tower, as proposed, the wireless communications facility and supporting structure will not blend into the surrounding residential environment including the existing church. . ."

31.    In total, the entitlement and permitting efforts took place between March 24, 2009 and March 15, 2010.

32.    T-Mobile timely filed this lawsuit on April 16, 2010.

33.    The City has not tendered any affirmative defenses or counterclaims.

**T-Mobile's Network in Huntington Beach**

34.    T-Mobile's network includes antenna facilities which must be located near to persons placing or receiving telephone calls or using data services.  These antenna facilities are referred to as "wireless telecommunications facilities," "personal wireless service facilities," "base stations" or, euphemistically, "cell sites."

35.    A wireless telecommunications facility consists of the antennas, the transmission equipment, the cables connecting the antennas to the transmission equipment, and all necessary utilities, including back haul.

36.    In a densely-populated and heavily-traveled area such as Huntington Beach, it is necessary to place wireless telecommunications facilities approximately 0.25 miles apart.

**Reliable In-Building Coverage is Essential to Consumers and Carriers**

37.    Wireless usage has grown exponentially in the last decade.  The number of wireless users (331 million as of December 2011) has grown to the point that there is now more than one wireless connection for each person in the United States. Furthermore, the capabilities of wireless devices have increased, providing talk, text and data services (for example, e-mail, internet, sending photographs or videos, videoconferencing, etc.)  A large and growing percentage of households are wireless-only.  Fifty percent of Americans use their wireless phone as their sole or essentially

sole communications device.  In the United States, wireless voice usage was above 1.1 trillion minutes per year, compared to 100 billion minutes of wireline interstate switched access minutes.  In other words, by December 2011, there were more than 11 times as many mobile minutes of use than wireline interstate switched access minutes.  The percentage of wireless calls placed in-building is high and rapidly increasing, growing from 40% in 2003 to 58% in 2012.  More specifically, the share of wireless calls from the home has increased significantly, from 25% in 2003 to 35% in 2011.  The importance of reliable in-building coverage is illustrated by the numerous E-911 calls placed from wireless devices.  The FCC estimates that 70% of E-911 calls are made from wireless devices, and the percentage is growing.  Approximately 2306 wireless E-911 calls were made on T-Mobile's network between December 2011 and June 2012 in the CUMC area.  Consumers and carriers have an expectation and a need for reliable in-building wireless service.  Providing reliable in-building service in the area surrounding CUMC is essential, and its absence constitutes a significant gap in coverage.

### Creation of the Search Ring

38.    T-Mobile's Irvine, California office regularly holds meetings attended by its design engineers and optimization engineers to determine whether and where additional wireless telecommunications facilities may be necessary to develop T-Mobile's network.   Such decisions are made based on information that includes how radiofrequency waves are behaving in a given area due to the performance of existing cell sites, which may result in dropped calls, system access failures, customer complaints, and other key performance and quality indicators.  The analysis includes a review of additional field measurements including coverage maps and/or drive test information.  As a result of such a meeting, the engineering group determined that a wireless telecommunications facility was necessary to serve the area surrounding Heil Avenue and Edwards Street in Huntington Beach.  The engineering group issued a

/ / /

search ring, designated as LA 33421A, for a wireless telecommunications facility to serve that area.

39.    A search ring is the area in which the wireless telecommunications facility should be placed in order to meet the coverage objective.  The engineering group bases the search ring upon the wireless grid plan.  Factors considered include the location of surrounding existing sites, the population density, environment (urban, suburban, rural), and topography/terrain.  An average cell radius is determined to balance the coverage and capacity for the network.  This is why densely populated areas like Huntington Beach utilize lower height facilities and a 0.25 mile or less search ring radius while rural areas with low population density utilize taller sites and a larger search ring radius of 0.5 mile or more.  A search ring is scientifically-based, determined by the propagation of radio frequency waves and the need to avoid interference with adjacent sites, and is not arbitrary.[1]

**A Significant Gap in T-Mobile's Coverage Exists in the Area Surrounding CUMC**

40.    T-Mobile has a significant gap in wireless service in the area surrounding the Heil Avenue and Edwards Street in Huntington Beach.  A gap in second generation ("2G") in-building service and third generation/fourth generation ("3G/4G") in-building service currently exists in the vicinity of the Facility.  T-Mobile also has a significant gap in reliable in-vehicle service in the vicinity of the Facility.

41.    Providing quality in-building voice and data services, with sufficient system capacity and high-speed data rates, is critical to T-Mobile's customers and is

/ / /

---

[1] The City argued that because T-Mobile created the search ring, T-Mobile could potentially limit the number of possible alternatives by artificially constricting the size of the ring.  The Court rejects this argument.  First, no evidence was presented that T-Mobile did in fact artificially limit the size of the ring.  Second, the existence of feasible alternative sites as a legal matter does not depend on the size of a "search ring," but instead depends upon whether such alternative sites do in fact exist.  Cf. MetroPCS, Inc. v. City & County of S.F., 400 F.3d 715, 725 (9th Cir. 2005).

essential to T-Mobile's ability to compete effectively with its functionally equivalent competitors such as Verizon Wireless, AT&T Mobility and Sprint.

42.     Positive wireless voice and data experience is the goal for all wireless providers.  A positive wireless experience includes the customer connecting to the network on the first try, staying connected throughout the call or data transmission, and the customer ending the call or data session when ready.  For data connections (e.g., internet browsing) the speed should be as fast as the technology allows.  A gap in service causes a negative experience: customers cannot place calls when they want to; when they are connected, voice call quality does not meet customer expectations or they do not choose when to end the call; or, the call simply drops off (disconnects) without notice.  When a gap in service exists with respect to data communications, the data experience is not instantaneous or is much slower than the customer requires.

43.     T-Mobile has a significant gap in service in the vicinity of the Facility, as measured by a lack of reliable in-building residential coverage.  T-Mobile also has a significant gap in reliable in-vehicle service.  T-Mobile also has a gap in reliable in-building and in-vehicle data service.  T-Mobile proved the significant gap in reliable service through advanced computer propagation modeling, actual drive test data, key performance indicator data and channel quality indicator data.

44.     Computer propagation modeling, actual drive test data, key performance indicator data and channel quality indicator data are routinely used by T-Mobile, and throughout the wireless industry, to reliably determine whether there is a gap in service that necessitates the installation of a new wireless telecommunications facility.

**T-Mobile's Significant Gap has Been Verified by Computer Propagation Modeling**

45.     T-Mobile proved the existence of the significant gap in coverage in the vicinity of the Facility through the use of scientifically- and mathematically-based computer modeling.  T-Mobile uses Aircom International's coverage planning tool, which is known as Asset.  Aircom International products are used in 135 countries and

by the world's top 20 wireless carriers.  Asset is a wireless coverage planning tool that T-Mobile uses for wireless network planning.  The Asset tool is used to create T-Mobile's propagation coverage maps ("Coverage Maps").

46.    Asset coverage maps predict the radio frequency ("RF") coverage and signal strengths that can be expected over a geographic area based on certain input parameters.  These parameters include factors such as:  the frequency of the RF signal; the height, gain and orientation of the antennas; the terrain over which the RF signals are being propagated; and the strength of the RF signals.  Thus, Coverage Maps predict the RF signal strength over geographic areas on a map.

47.    The Asset planning tool is utilized by T-Mobile RF engineers to evaluate and plan coverage throughout the country.  The Coverage Maps produced by T-Mobile using Asset are highly reliable and scientifically based and are used for the purpose of depicting T-Mobile's current and proposed wireless coverage within the City of Huntington Beach and throughout the country.

48.    T-Mobile's gap in 2G service as shown by the Coverage Maps is significant.  T-Mobile's 2G in-building gap in this area is approximately 0.9 square miles based on a combined analysis of Coverage Maps and drive test results (discussed below).  The in-building gap extends as follows:

- •    Over 1.1 miles along Springdale Street
- •    Over 1 mile along Edwards Street
- •    0.42 mile along Goldenwest Street
- •    Over 1.4 miles along Heil Avenue
- •    0.53 mile along Warner Avenue
- •    Includes buildings and residents along:  Shields Dr., Gumm Dr., Christy Dr., Softwind Dr., Brad Dr., Bishop Dr., Auburn Dr., Edgemont Dr., Defiance Dr., Nyanza Dr., Montecito Dr., Palisade Dr., Gloria Dr., Jean Dr., Busby Ln,, Robert Ln., Trudy Ln., Mytinger Ln., Angler Ln., Bradbury Ln., Duchess Ln., Gentry Ln., Underhill Ln., Mercler Ln., Normandy Ln., Howland Ln., Oakmont Ln., Lakemont

Ln., Windemeir Ln., Redlands Ln., Tufts Ln., Patricia Ln., Fountain Ln., Cooper Ln., Dale Vista Ln.

• Includes homes, the Church, parks and schools such as College View Elementary School and Spring View Middle School, within these boundaries.

49. Accordingly, T-Mobile's gap in service covers an area that is more than a mere few blocks and larger than a mere dead spot.

50. The significance of the lack of wireless coverage and the gap in service is further demonstrated by the population data in the area of the proposed Facility. According to 2010 U.S. Census data, there are approximately 9,731 residents in the in-building coverage "gap" area (determined by comparing the population data with the information shown on a map of the area), which amounts to more than just a few homes at the end of a cul-de-sac.[2]

51. The average annual daily vehicular traffic counts (ADT), according to statistics supplied by the City, on the surrounding roads is as follows:

• Heil Ave - approximately 12,000 ADT

• Warner Ave - approximately 36,000 ADT

• Goldenwest St. - approximately 36,000 ADT

• Edwards St. - approximately 17,000 ADT

These streets are major arterial roads, according to the City. These vehicular traffic counts demonstrate that there are a significant number of trips through and travelers within T-Mobile's gap area.

52. The large geographic area affected by the lack of reliable wireless coverage, the population and vehicular traffic figures within this area, and the presence of institutions such as Community United Methodist Church, College View

---

[2] The City's witness, Leslie Edwards, testified that, using a different technique of estimating population, 9,236 people live in the in-building coverage gap. The Court need not decide the precise population of persons residing in the coverage gap; it is sufficient to note that either figure represents a significant number of people.

Elementary School and Spring View Middle School, further demonstrate the effect on existing and potential customers in the area of the proposed Facility and the significance of the gap in service.

53.     T-Mobile presented Coverage Maps showing T-Mobile's existing 2G coverage, together with the predicted 2G coverage that the Facility will provide. The Facility will remedy a major portion of T-Mobile's significant gap in 2G in-building coverage in the vicinity of the Facility.

54.     Federally licensed wireless carriers such as T-Mobile have licensed additional FCC spectrum to construct 3G/4G networks to increase system capacity and to meet consumer demand for advanced wireless services, including internet access, the transmission of e mails, text messages, photographs, video, video conferencing and other forms of data in a mobile environment. It is necessary for T-Mobile to provide 3G/4G services throughout its federally licensed coverage area in order to provide consumers with the wireless services they demand, and to remain competitive with T-Mobile's functionally equivalent competitors. The ability of T-Mobile customers to make an E-911 call from a mobile device is of critical importance for public safety. Reliable 3G/4G service is critical even in cases where some 2G service is present. For example, a customer using a 3G/4G mobile device may not be able to make a call, including an E-911 call, if there is a gap in 3G/4G service. In the event the signal strength is strong enough for the customer's 3G/4G mobile device to lock onto the 3G/4G network, but the signal quality is insufficient to support a call, the network will be unable to support a 3G/4G call and will not hand the call down to the 2G network even if there is 2G service available. For all of these reasons, it is necessary for T-Mobile to have 3G/4G service in areas that may already have 2G service.

55.     In contrast to a 2G network, signal strength is not the single most important objective when designing and operating 3G/4G networks; signal quality is of greater importance because the same frequencies are used at each adjoining site.

/ / /

Operating efficient 3G/4G networks requires that signal interference among adjoining sites be strictly controlled.

56.     T-Mobile presented Coverage Maps that indicate T-Mobile's existing areas of reliable 3G/4G wireless coverage from existing sites adjacent to the proposed Facility.  Those maps demonstrate that T-Mobile has a significant gap in reliable 3G/4G wireless coverage.

57.     T-Mobile's gap in reliable 3G/4G voice service is significant.  T-Mobile's gap in this area is approximately 0.66 square miles.  The in-building gap extends as follows:

- •     0.3 mile along Springdale Street
- •     0.72 mile along Edwards Street
- •     0.28 mile along Goldenwest Street
- •     Over 1 miles along Heil Avenue
- •     0.24 mile along Warner Avenue
- •     Also includes buildings and residents along: Shields Dr., Gumm Dr., Christy Dr., Softwind Dr., Brad Dr., Bishop Dr., Auburn Dr., Edgemont Dr., Defiance Dr., Nyanza Dr., Montecito Dr., Palisade Dr., Gloria Dr., Jean Dr., Busby Ln., Robert Ln., Trudy Ln., Mytinger Ln., Angler Ln., Bradbury Ln., Duchess Ln., Gentry Ln., Underhill Ln., Mercler Ln., Normandy Ln., Rowland Ln., Oakmont Ln., Lakemont Ln., Windemeir Ln., Redlands Ln., Tufts Ln., Patricia Ln., Fountain Ln., Cooper Ln., Dale Vista Ln.
- •     Includes homes, the Church, parks and schools (College View Elementary and Spring View Middle School) within these boundaries.

58.     Accordingly, T-Mobile's gap in 3G/4G service covers an area that is more than a mere few blocks and larger than a mere dead spot.  The significance of the lack of reliable wireless coverage and the gap in service is further demonstrated by the population and traffic data in the area of the proposed Facility.  According to 2010

/ / /

14

U.S. Census data, there are approximately 4,983 residents in the in-building coverage area, which amounts to more than just a few homes at the end of a cul-de-sac.

59.     The average annual daily vehicular traffic counts (ADT), according to statistics supplied by the City, on the surrounding roads is as follows:

- • Heil Ave - approximately 12,000 ADT
- • Warner Ave - approximately 36,000 ADT
- • Goldenwest St. - approximately 36,000 ADT
- • Edwards St. - approximately 17,000 ADT

These streets are major arterial roads, according to the City.

60.     These vehicular traffic counts demonstrate that there are a significant number of travelers in T-Mobile's 3G/4G gap area.  The large geographic area affected by the lack of reliable wireless coverage, the population and vehicular traffic figures within this area, and the presence of institutions such as Community United Methodist Church, College View Elementary School and Spring View Middle School further demonstrate the effect on existing and potential customers in the area of the proposed Facility and the significance of the gap in service.

61.     T-Mobile presented Coverage Maps indicating T-Mobile's existing 3G/4G reliable voice coverage, together with the proposed 3G/4G reliable coverage that the proposed Facility will provide.  The Facility will remedy a major portion of T-Mobile's significant gap in reliable 3G/4G in-building coverage in the vicinity of the Facility.

62.     In summary, T-Mobile has a significant gap in wireless service and the proposed Facility will remedy T-Mobile's gap in service in the vicinity of CUMC.

**T-Mobile's Significant Gap has Been Verified by Actual Drive Test Data**

63.     Coverage Maps are routinely used by wireless carriers to predict areas of reliable coverage over geographic areas.  Coverage Maps are accurate and reliable, and offer the benefit of predicting existing and proposed areas of coverage over an entire geographic area, including areas that may not be easily accessible for testing, such as

inside homes.  Scan tests are another scientific means to evaluate existing coverage and to evaluate the reliability of Coverage Maps.  Scan tests are used to produce maps ("Drive Test Maps"), which demonstrate actual signal levels along roadways that are traveled by specially equipped scan test vehicles.  In a Drive Test, the signals from the surrounding on-air sites are collected by a receive antenna mounted to the roof of the scan test vehicle.  The data collected by the receive antenna is then processed by computer equipment within the scan test vehicle.  The coordinates and signal strength of each collection point is recorded by the computer equipment and ultimately depicted on a Drive Test Map.  Thousands of data points are collected during a scan test over the roadways driven by the scan test vehicle to ensure that a complete and statistically relevant number of data points can be evaluated.

64.     T-Mobile presented Drive Test Maps that demonstrate the results of a scan test performed by T-Mobile for the purposes of confirming existing 2G coverage in the area of the Facility.  The 2G drive test maps confirm that T-Mobile has a significant gap in reliable 2G in-building residential and in-vehicle coverage in the vicinity of the Facility.

65.     T-Mobile presented a Drive Test Map that demonstrates the results of a scan test performed by T-Mobile for the purposes of confirming existing 3G/4G voice coverage in the area of the Facility.  The 3G/4G Drive Test Map confirms that T-Mobile has a significant gap in reliable in-building residential and in-vehicle coverage in the vicinity of the Facility.

66.     Taken together, Coverage Maps and Drive Test Maps provide a reliable method to evaluate whether there is a significant gap in coverage that is commonly used by radiofrequency engineers and the wireless industry.

67.     The Drive Test Maps presented at trial are highly consistent with each other and with the Coverage Maps, and thus the Coverage Maps accurately predict T-Mobile's existing and proposed coverage throughout the area surrounding the Facility.  Moreover, the Coverage Maps and the Drive Test Maps taken together prove that T-

Mobile has a significant gap in service in the vicinity of the Facility, and that the proposed Facility will remedy a portion of T-Mobile's significant gap in service.

**T-Mobile's Significant Gap has Been Verified by Key System Performance Indicator Data**

68.     T-Mobile also presented evidence regarding its Key System Performance Indicator Data ("KPI Data").  The KPI Data further support the conclusions from the Coverage Maps and the Drive Test Maps.  The dropped call rate and call access failure rate are two performance indicators of a wireless network having a gap in reliable service.  Dropped calls, meaning calls that are prematurely ended by the network rather than the customer, are an indicator that the signal strength and/or signal quality is unreliable and lacking such that calls or data connections are disconnected.  Call access failures, meaning the inability for a customer to place a call, are indicators that the signal strength and/or quality are unreliable and lacking such that calls or data sessions are unable to be established at the will of the customer.  T-Mobile's significant gap in service and the need for the proposed Facility is confirmed by the actual system performance data for the existing sites surrounding the proposed Facility.

69.     KPI Data was presented for the sectors of the antennas facing T-Mobile's gap area for each surrounding on-air site.  The drop call percentages and the access failure percentages indicate that T-Mobile has a significant gap in wireless service in the areas surrounding the proposed Facility.  Any dropped call or access failure can be deemed unacceptable to a wireless customer, particularly in an emergency situation. T-Mobile has established a dropped call rate of greater than 1% or an access failure rate of greater than 2% as a measure of unreliable wireless coverage.  These rates are commonly accepted in the industry.  The charts of the drop call rate and access failure rate presented by Mr. Conroy demonstrate the lack of reliable signal in the area and show rates of dropped calls and access failure consistently above the standard.  The significantly elevated number of dropped calls and access failures in the area are due

directly to the lack of reliable wireless coverage in the area surrounding the proposed Facility.

70.     The elevated dropped call and access failure rate in the area surrounding the proposed Facility has great significance when taking into account the high number of E-911 calls placed in the area.  Between December 2011 and June 2012 there were over 2,306 E-911 calls placed from immediately adjacent surrounding sites.

**T-Mobile's Significant Gap has Been Verified by Channel Quality Indicator Data**

71.     Channel Quality Indicator ("CQI") data refers to the ability to attain high speed data connections necessary to provide reliable 3G/4G wireless service.  In order to ensure reliable 3G/4G speeds, the target for the CQI metric is in the range of 26-30. This standard is common and accepted in the industry.  The lower the CQI number, the slower the data connections.  Slower data connections are indicative of poor signal or quality conditions in the network.  Faster customer data experiences also result in improved overall network performance.  A user that experiences faster speeds will generally "free up" the network for the next user and therefore create a faster experience for other users, thereby eliminating lag, access and drops.  The average CQI numbers range between 16.95 to 19.01 for the neighboring existing on-air sites, which is well below the target range of 26 to 30.  The proposed Facility will significantly improve the CQI metrics for the neighboring sites, which will result in higher data throughput speeds for existing and potential T-Mobile customers.

**The City Did Not Refute That a Significant Gap in Coverage Exists**

72.     The City did not seriously contest expert witness Richard Conroy's testimony that a significant gap in coverage exists in the area of CUMC.

73.     The City merely claimed that fewer people live in the area to be served by the Facility than T-Mobile proved.  However, the City admitted that a significant number of people live in the area to be served (9,286, according to the City's witness). The City also admitted that the area to be served contains major arterial roads that are

traveled by tens of thousands of people per day.  The City also admitted that the area with the gap in service contains schools, parks and the Church, which are used by persons living in the coverage objective and those living elsewhere in the City.[3]

### The Gap Cannot Be Solved by Adjusting Neighboring Sites

74.    T-Mobile, as a regular part of its business, monitors its network in order to optimize the system's performance.

75.    Specifically, T-Mobile monitors the performance of the existing, on-air sites surrounding the demonstrated gap in coverage in the vicinity of CUMC.  T-Mobile has optimized the performance of surrounding antennas.  The gap in coverage cannot be resolved through further adjustment of surrounding antennas.

### Personal Coverage Check Maps Are Not System Design Tools

76.    Personal Coverage Check ("PCC") is T-Mobile's web-based tool that customers can use to estimate the wireless coverage available from existing T-Mobile cell sites for specific outdoor locations within T-Mobile's nationwide network.  T-Mobile provides PCC maps to assist its customers and potential customers in making decisions on whether a T-Mobile service plan provides the type of coverage quality they are seeking in the area(s) where they need it.  Sales representatives use PCC maps at the point of sale to provide the customer with an estimated view of coverage prior to making a purchase.  T-Mobile improved its PCC web-based presentation in June 2012.

///

---

[3] The City also argued that the number of T-Mobile subscribers living in the coverage gap is relevant to the significance of the gap.  The Court disagrees.  To determine whether a significant gap exists, a court must consider "the number of potential users in that area who may be affected by the alleged lack of service.  Sprint PCS Assets, L.L.C. v. City of Palos Verdes Estates, 583 F.3d 716, 727 (9th Cir. 2009) (quotation omitted).  The number of potential users includes all potential users of wireless services, not just those who are subscribers of one particular wireless provider.  To find otherwise would contravene one of the principal purposes of the Telecommunications Act, which is to promote competition among providers.  See MetroPCS, 400 F.3d at 732.  This purpose is best served by permitting providers to improve their coverage in an area where a gap in coverage exists and a number of potential users reside, not merely those areas where large numbers of current subscribers reside.

77.     T-Mobile's attempts to provide consumers with additional information are distinct from T-Mobile's system design methodology.

78.     The PCC maps, while attempting to approximate T-Mobile's wireless coverage area, do not take into consideration factors such as network changes, call traffic volume, technical limitations, handset capabilities, structures, foliage, and other conditions that may interfere with actual service at any point in time to the same detailed extent as Coverage Maps or Drive Test Maps.  PCC Maps also do not account for customer traffic on the network and, therefore, 3G/4G coverage may vary over time.

79.     The foregoing PCC Map limitations are expressly detailed on T-Mobile's website:

MAP INFORMATION:  Maps approximate anticipated coverage outdoors, which may include limited or no coverage areas, and do not guarantee service availability.  Within coverage areas, network changes, traffic volume, outages, technical limitations, signal strength, your equipment, obstructions, weather and other conditions may interfere with service quality and availability. Capable device required for network connection and 3G and 4G speeds.  Home internet speeds vary widely.  Maps do not reflect coverage areas for Prepaid/Monthly4G service.  See Prepaid/Monthly4G coverage map for details. Roaming Partner: Roaming refers to usage while on a roaming partners' network within coverage area; not available for Mobile Broadband plans.  Your roaming and on-network data allotments may differ; see rate plan for details.  We are not responsible for the performance of our roaming partners' networks.  International roaming incurs additional charges and refers to usage outside of the US. Some areas of roaming coverage require a multi-band device.  Certain devices and features will not work when roaming.  Ask a sales representative or visit www.T-Mobile.com/coverage for more information.  If you travel outside of coverage areas, your device will not work.

80.     While PCC Maps are tools for T-Mobile consumers to use in making choices about how to meet wireless service needs, these maps are not as detailed as the Propagation Maps or Drive Test Maps that T-Mobile uses to plan network integrity and expansion based on technical product and application advancements and consumer demand.

81.     Unlike PCC Maps, Coverage Maps and Drive Test Maps are intended to demonstrate T-Mobile's existing and proposed reliable wireless coverage for purposes of establishing the need for a wireless telecommunications facility necessary to remedy a significant gap in reliable wireless service within buildings and vehicles in a given area.  In contrast, PCC Maps are intended to assist in the marketing of T-Mobile's wireless service plans and demonstrate T-Mobile's wireless signal quality outdoors. PCC Maps are not system engineering or design tools.

82.     PCC Maps characterize estimated coverage as "excellent," "very good/very strong," "good," or "satisfactory."   Such characterizations do not necessarily correlate directly to T-Mobile's engineering design criteria signal level contours.  For example, the PCC includes a contour that represents outdoor coverage only, which is below T-Mobile's engineering design criteria.  In addition, Coverage Maps account for the results of recent Drive Test data.  Accordingly, PCC Maps and propagation Coverage Maps cannot be directly compared.

83.     In much of the area surrounding CUMC, the PCC Map shows "good" service.  This is the second lowest level of service on the scale from "excellent" down to "satisfactory."  The definition of "good" presented on the PCC Map is "You can usually connect in some homes, cars, and outdoors" (emphasis added).  This is consistent with a lack of reliable in-building service.

**PCC Maps Are Smoothed and Contoured For Ease of Use by Consumers and Web Presentation Purposes.**

84.     The PCC Maps and the Coverage Maps are generated using the same general predictive modeling tool (Asset).  However, for ease of use by consumers, the

PCC Maps are "smoothed" (by using a 100 meter bin size rather than a more detailed 25 meter bin size used for the preparation of the Coverage Maps) and are "contoured," thereby creating visual differences in the coverage design thresholds.  "Smoothing" and "contouring" are processes necessary to speed up web presentation and improve the presentation quality of the maps for viewing purposes.  The result of "smoothing" and "contouring" is that the PCC Maps do not show the precision and depth of detail of the Coverage Maps.

85.    Smoothing is the process of filtering a grid by calculating the numeric values of every bin to be the average of its neighboring bins.  Smoothing averages out the data in the grid to provide a high-level or more relative representation of the data, resulting in more generalized signal level contours.  The PCC Maps are smoothed by using a nine square 25 meter bin grid, resulting in more generalized 100 meter signal level bin maps that are less detailed than the Coverage Maps, but that are believed to be much easier to visualize by the average consumer.  The generalized 100 meter bin PCC Maps are also more capable of being presented to the consumer on T-Mobile's website due to graphic and web speed limitations.

86.    Accordingly, based on the smoothing process, the PCC Maps do not contain signal level data at any particular location to the same level of detail and accuracy as the Coverage Maps.

87.    Contouring is the process of threading polylines, or contour lines, through an existing grid in order to round out the pixilated edges.  Using bins creates a choppy, pixilated picture of coverage that the typical consumer may have trouble interpreting.  The raster image created through the 100 meter bin smoothing process is contoured to provide a map that is easy to interpret by the consumer's eye.  Positioning of the contour lines is accomplished through interpolation by evaluating the values of and distance to the surrounding bins.  The contouring process improves the presentation quality of the PCC Maps for sales information purposes by effectively mitigating spikes and valleys in signal level data.  However, the contouring process used in the

PCC Maps thereby further generalizes the actual signal level data at a given point in comparison to Coverage Maps.

88.     PCC Maps and Coverage Maps are designed for and serve different purposes.  The PCC Maps and the Coverage Maps do not attempt to demonstrate the same levels of wireless service.  The PCC Maps are smoothed and contoured, resulting in different visual presentations of coverage areas when compared to Coverage Maps. PCC Maps only provide a limited level of detail about the RF coverage in a given area. Coverage Maps are far more detailed, much more accurate in predicting a specific RF signal strength at a given location and provide predictions of RF coverage at RF signal strengths for reliable residential in-building coverage not detailed on the PCC Maps.

89.     In determining whether T-Mobile has reliable in-vehicle or in-building wireless coverage in a given area, Coverage Maps and Drive Test Maps, and not the PCC Maps, should be primarily consulted and relied upon.

**Summary Regarding the Significant Gap in Service**

90.     In summary, T-Mobile has a gap in in-building and in-vehicle 2G and 3G/4G service caused by a lack of reliable coverage in the area surrounding the proposed Facility.  The gap in service is significant based on a number of relevant factors existing in the area surrounding the proposed Facility, including: the number of residents who live in the gap area, the traffic that travels along the major arterial roads and other roads, and the presence of residential uses of single family dwellings, the Church, parks, and schools within the gap area.  The proposed Facility will remedy T-Mobile's significant gap in service in the area surrounding the proposed Facility.

91.     The existing on-air sites providing coverage to the area are limited due to their low antenna height.  This limitation contributed to an in-building and in-vehicle 2G and 3G/4G coverage gap within the dense residential area of Huntington Beach. To meet the coverage objectives the location of the Facility is very specific and defined by the search ring.  As such, no other alternate site was available.

/ / /

92.     PCC Maps are not design tools.  Their purpose is to provide a simple and easily readable overview of the network's coverage.  Detail regarding the signal strength necessary to provide reliable service according to the engineering design criteria is performed through more precise analysis.  This analysis is performed utilizing more resolute Asset propagation analysis, drive test collection, and analysis and study of system key performance indicators and channel quality indicators.  In addition, the PCC Maps show that coverage in the CUMC area is only "good," which is the second lowest level of coverage, and equates to a lack of reliable in-building coverage.

**CUMC is the Least Intrusive Means to Fill the Gap in Service**

93.     The search for possible locations for a wireless telecommunications facility was complicated by the fact that the entire area surrounding Heil Avenue and Edwards Street is composed of residences, with a few parks, schools, the public right of way, and CUMC.

94.     T-Mobile performed a meaningful analysis of alternative locations.  CUMC is the least intrusive means to fill the demonstrated gap in service.

95.     T-Mobile considered CUMC, College View Park, Irby Park, Carr Park, College View Elementary School, Spring View Middle School, the public right of way, St. Bonaventure Catholic Church, and Holy Redeemer Lutheran Church as possible locations for the wireless telecommunications facility.[4]

96.     T-Mobile submitted a comprehensive permit application, discussing its consideration of alternative locations to CUMC.  The City officially declared T-Mobile's application to be complete.

---

[4] The City claims that T-Mobile concealed from the City that T-Mobile had considered St. Bonaventure and Holy Redeemer as possible alternative sites. However, the Court finds this assertion unsupported by the evidence.  In the first permit application, T-Mobile stated, "T-Mobile research[ed] the possibility of a facility in alternative locations such as: Redeemer Lutheran Church, St. Bonaventure Roman Catholic Church, and even city parks."  Trial Ex. 8 at p. TM/CU000124.

97.     To be a feasible candidate, a location must be technologically feasible, leasable, zoneable and buildable.

98.     CUMC is technologically feasible, leasable, zoneable and buildable.  A facility located at CUMC will address the gap in coverage.  The Church entered into a lease agreement with T-Mobile.  The Facility meets zoning requirements.  The Facility contains all necessary utility and other requirements to build a wireless telecommunications facility.

99.     T-Mobile presented photographs of numerous telecommunications facilities in nearby cities "stealthed" as bell towers located at churches.  Many of these examples are in residential neighborhoods.  Some were newly erected, as cell sites; others replaced existing church bell towers.  These examples demonstrate that wireless telecommunications facilities hidden within church bell towers are a common, accepted and effective means of designing a stealthed wireless telecommunications facility in a manner compatible with a church and a residential neighborhood.

100.    T-Mobile presented photosimulations of what the wireless telecommunications facility at CUMC would look like, when built.  The photosimulations show the facility from a number of different directions.  The photosimulations show that the antennas, cables and radio equipment will not be observable at all.  The difference between the current 52 foot bell tower and the proposed 55 foot bell tower is barely perceptible.

101.    Existing trees, in fact, would screen the proposed CUMC bell tower wireless telecommunication facility from being seen by neighbors from several directions.

102.    Existing poles, wires and other items in the right of way along Heil Avenue will further screen the proposed CUMC bell tower wireless telecommunications facility from view.

/ / /

/ / /

103.   The City stipulated for trial that College View Park, Irby Park, Carr Park, College View Elementary School, Spring View Middle School, the public right of way, and Holy Redeemer Lutheran Church are all not available alternatives to CUMC.

104.   T-Mobile's uncontroverted testimony demonstrates that a wireless telecommunication facility located at St. Bonaventure Church would not remedy T-Mobile's significant gap in service in the vicinity of Heil Avenue and Edwards Street. In fact, the testimony made clear that even if a site was constructed at St. Bonaventure Church, T-Mobile would still require a site at CUMC.  A site at St. Bonaventure would also require a new vertical structure to be built, whereas at CUMC a new bell tower could replace an existing one of similar height and design.

105.   The City had already indicated in connection with CUMC that a tree design would be less desirable aesthetically than a bell tower design.  A rooftop design on the Church building at St. Bonaventure may not even be possible, given the stained glass in the building and the weight of the wireless telecommunications facility. Obtaining permits at the St. Bonaventure location is speculative, at best.  The City has never indicated that it would grant permits for a wireless telecommunications facility at St. Bonaventure.  Any permits granted would be subject to public hearings and a political process similar to that which resulted in the denial of the permits for CUMC. There is no evidence that St. Bonaventure would enter into a lease with T-Mobile.

106.   The City never suggested an alternative location to CUMC until the trial. Until the trial of this case, the City never indicated that it would prefer any location over CUMC.  The City, in fact, proposed the bell tower design at CUMC to T-Mobile.

107.   To the extent necessary, each of these findings of fact may be deemed to be a conclusion of law.

/ / /

/ / /

/ / /

/ / /

26

## CONCLUSIONS OF LAW

**Congress Intended Section 332 of the Telecom Act to Accelerate Deployment of Wireless Telecommunications Services and Increase Competition**

108.   Prompted by rapidly developing wireless technology and the need to ensure its timely deployment, Congress amended the Communications Act of 1934 by enacting the Telecommunications Act of 1996 (the "Telecom Act" or "TCA").  The Telecom Act is expansive legislation intended to increase and improve competition in the telecommunications industry.  An important purpose of the Telecom Act is to "accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services to all Americans by opening all telecommunications markets to competition . . . ."  H.R. Conf. Rep. No. 458, 104th Cong., 2d Sess. 1 (1996).

109.   In enacting the Telecom Act, Congress gave due consideration to the potential conflict between local government regulation of the placement and aesthetic impacts of wireless telecommunications facilities, weighed against the national need for rapid deployment of economical, effective and competitive wireless services.

110.   Accordingly, 47 U.S.C. § 332(c)(7), while preserving a degree of local authority "over decisions regarding the placement, construction, and modification" of wireless facilities, imposes significant constraints on such decisions.  Congress's intention in enacting Section 332(c)(7) was to limit the ability of local governments to impede or hamper the deployment of telecommunications services and technologies. The Supreme Court has described Congress's intention, explaining:

> One of the means by which [Congress] sought to accomplish these goals [of telecommunications deployment] was reduction of the impediments imposed by local governments upon the installation of facilities for wireless communications, such as antenna towers.  To this end, the [Telecom Act] amended the Communications Act of 1934 to include § 332(c)(7), which

imposes specific limitations on the traditional authority of state and local governments to regulate the location, construction and modification of such facilities.

City of Rancho Palos Verdes v. Abrams, 544 U.S. 113, 115 (2005) (internal citations omitted).  The concurrence in Abrams further explained, "Congress saw a national problem, namely an 'inconsistent and, at times, conflicting patchwork' of state and local siting requirements, which threatened 'the deployment' of a national wireless communications system."  Id. at 127-28 (Breyer, J., conc.) (quoting H.R. Rep. No. 104-204, pt. 1, p.94).  Other courts have likewise articulated that Section 332(c)(7)(B) was intended to limit the powers of cities, not provide a basis for them to impede construction of telecommunications infrastructure:

> [T]he [Telecom Act's] substantive provisions provide standards that the local government must meet.  The Board could only apply the criteria set forth in the local zoning ordinance.  To find otherwise would convert the [Telecom Act] from a measure that reduces impediments to the installation of wireless communications facilities into a measure that imposes such impediments.
>
> Needless to say, that result would frustrate the central function of the statute.

T-Mobile Central, LLC v. Unified Gov't of Wyandotte County, 546 F.3d 1299, 1310 n.5 (10th Cir. 2008).

111.   Thus, Section 332(c)(7) imposes a series of restrictions on the zoning authority of localities, including that local zoning decisions may not "unreasonably discriminate among providers of functionally equivalent services" (47 U.S.C. § 332(c)(7)(B)(i)(I)).  Furthermore, "[n]o State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the [FCC's] regulations concerning such emissions."  47 U.S.C. § 332(c)(7)(B)(iv).  Moreover, state and local governments must act on requests for authorization to place, construct, or modify

personal wireless service facilities "within a reasonable period of time" (47 U.S.C. § 332(c)(7)(B)(ii)).

112.   The limitation on local zoning authority at issue in this case directs that local zoning decisions may not "prohibit or have the effect of prohibiting the provision of personal wireless services," 47 U.S.C. § 332(c)(7)(B)(i)(II).  This provision is often referred to as the Effective Prohibition clause of Section 332.

**The City's Denial Constitutes an Effective Prohibition of Service Because It Effectively Prohibits T-Mobile from Using the Least Intrusive Means to Fill a Significant Gap in Coverage**

113.   The City's denial of permits violates 47 U.S.C. § 332(c)(7)(B)(i)(II), which provides that it is unlawful for a public agency to deny a permit which will "prohibit or have the effect of prohibiting the provision of personal wireless services." A ban on new wireless services would constitute a prohibition of personal wireless services.  MetroPCS, Inc. v. City & County of San Francisco, 400 F.3d 715, 730-31 (9th Cir. 2005).  But short of an outright ban, a denial of a permit for an individual location constitutes an effective prohibition based upon "a two-pronged analysis requiring (1) the showing of a 'significant gap' in service coverage and (2) some inquiry into the feasibility of alternative facilities or site locations."  Id. at 731.

**Significant Gap**

114.   In MetroPCS, the Ninth Circuit held that a "significant gap in service (and thus an effective prohibition of service) exists whenever a provider is prevented from filling a significant gap in its own coverage."  400 F.3d at 733.

115.   Moreover, a gap in a provider's in-building coverage that consists of more than a few isolated pockets of inadequate in-building coverage suffices to show a significant gap exists.  MetroPCS v. City & County of San Francisco, 2006 U.S. Dist Lexis 43985 at **33-34 (N.D. Cal. June 16, 2006), on remand from 400 F.3d 715 (9th Cir. 2005) ("where coverage holes are large or frequent in number and size, or extend to the interior of buildings in urban areas or to a significant number of residences in

well-populated areas, such coverage holds <u>are</u> actionable under the [Telecom Act]." (citations omitted).

116.   T-Mobile established that a gap in service exists in the area surrounding Heil Avenue and Edwards Street, Huntington Beach.

117.   T-Mobile established that this gap in coverage is significant.  <u>See Sprint PCS Assets, LLC v. City of Palos Verdes Estates</u>, 583 F.3d 716, 727 (9th Cir. 2009).

118.   47 C.F.R. § 22.99 defines the term "Dead spots" as "small areas within a service area where the field strength is lower than the minimum level for reliable service.  Service within dead spots is presumed."  The gap described at trial is not a mere dead spot.  It is large in size, highly populated, highly traveled, and contains numerous homes, a church, schools and parks.

119.   The evidence in this case demonstrates that each of the gaps in coverage– in-building and in-vehicle, 2G and 3G/4G–constitutes a significant gap.

**The Burden of Proof Shifted to the City**

120.   In <u>T-Mobile v. City of Anacortes</u>, 572 F.3d 987, 998 (9th Cir. 2009), the Ninth Circuit held that when a provider files a comprehensive permit application making a prima facie showing that the proposed facility is the least intrusive means of filling a significant gap, the locality cannot simply reject the provider's evidence. Instead, the burden of proof shifts to the locality to show there are potentially available and technologically feasible alternatives.  <u>Id</u>.  A speculative alternative is not a viable alternative.  <u>Id</u>.

121.   The burden of proof properly shifts to the City in such a circumstance. This standard "allows for a meaningful comparison of alternative sites before the siting application is needlessly repeated.  It also gives providers an incentive to choose the least intrusive site in their first siting applications, . . . not merely the last one remaining after a series of application denials."  <u>Anacortes</u>, 572 F.3d at 995.

/ / /

/ / /

**T-Mobile Made a Prima Facie Showing That the Facility is the Least Intrusive, Technologically Feasible and Available Means to Fill the Significant Gap in Coverage**

122.   T-Mobile established that the Facility is the least intrusive means by undertaking a "meaningful comparison of alternative sites" to identify "the best solution for the community," that resulted in selecting the proposed site at CUMC. MetroPCS, 400 F.3d at 735.  T-Mobile analyzed multiple alternatives.

123.   T-Mobile identified a gap in its coverage in the area surrounding CUMC. From there, its engineers established a "search ring" around the gap, where, in theory, a facility may be technologically capable of addressing the coverage gap.  T-Mobile then searched for, and analyzed, locations in the search ring.  In assessing the feasibility of a location, T-Mobile considered whether the potential site was technologically feasible, leasable, zoneable and buildable.  See Anacortes, 572 F.3d at 998, 999.

124.   To be technologically feasible, the proposed site must be able to address the gap in coverage.  This required, for example, consideration of topography and other natural or man-made structures and the elevation of the alternatives.

125.   To be feasible, a site must be leasable.  This means that the property owner must be willing to lease space for the wireless telecommunications facility.

126.   An alternative must also be zoneable.  That is, it must be zoned to allow for wireless telecommunications facilities, at the height necessary to provide coverage.

127.   An alternative must also be buildable.  It must have access to utilities, it must be capable of supporting the antennas, and there must be enough space to place the antennas and other equipment.

128.   In this case, the search for sites was complicated by the fact that the entire area is composed of residences, with a few parks, schools, the public right of way, and CUMC.  There is no commercial area within the search ring.

///

129.   In light of these constraints, T-Mobile analyzed alternative locations both inside and outside the search ring:  CUMC, College View Elementary School, Spring View Middle School, College View Park, Irby Park, Carr Park, attaching to one or more poles in the public right of way, St. Bonaventure Catholic Church and Holy Redeemer Lutheran Church.

130.   Of these locations, only CUMC is technologically feasible, leasable, zoneable and buildable.  It is the least intrusive means to fill the gap in coverage.  See Anacortes, 572 F.3d at 998, 999.

131.   T-Mobile's analysis, therefore, established a prima facie case that the Facility is the least intrusive alternative.  MetroPCS, 400 F.3d at 735.

**The City Has Failed to Carry Its Burden of Showing That There is a Less Intrusive, Potentially Available and Technologically Feasible Alternative**

132.   Based on T-Mobile's prima facie showing that the Facility is the least intrusive, technologically feasible and available means to fill the significant gap, the burden shifted to the City to show that there are other technological, feasible, potentially available and less intrusive means to fill the gap in coverage.  Anacortes, 572 F.3d at 998.

133.   The City has failed in its burden of showing that there are technologically feasible, potentially available, zoneable and less intrusive means to fill the gap in coverage.  Anacortes, 572 F.3d at 998.

134.   T-Mobile presented photosimulations of the Facility demonstrating the minimal, indeed almost imperceptible, extent of the visual impact of the Facility.

135.   Prior to trial, the City never proposed any alternative site that it contended would address the gap in coverage on which it would grant T-Mobile permits.

136.   To the contrary, the City itself proposed the bell tower design at CUMC as a superior design from an aesthetic standpoint.

137.   St. Bonaventure is not the least intrusive alternative.

/ / /

138.   In fact, St. Bonaventure has not been proven to be a feasible alternative. See Anacortes, 572 F.3d at 999.  It will not remedy the significant gap in coverage surrounding Heil Avenue and Edwards Street; no evidence was presented that the Church will lease the property to T-Mobile; the ability to obtain permits is speculative; and there are doubts that a rooftop design is buildable.[5]

139.   CUMC is the least intrusive means of addressing the significant gap in coverage.

140.   Therefore, the City's denial of permits for the Facility at CUMC constitutes an effective prohibition of service in violation of 47 U.S.C. § 332(C)(7)(B)(i)(II).

**The Proper Remedy is an Injunction Ordering Issuance of the Permits**

141.   Where, as here, a public agency fails to comply with Section 332(c)(7) of the Telecommunications Act, the "appropriate remedy is injunctive relief in the form of an order to issue the relevant permits" because "injunctive relief best serves the [Act's] stated goal of expediting resolution of this type of action." Cellular Tel. Co. v. Town of Oyster Bay, 166 F.3d 490, 497 (2d Cir. 1999).  The matter should not be remanded to the City.  To do so would "frustrate the TCA's interest to provide aggrieved parties full relief on an expedited basis." Omnipoint Corp. v. Zoning Hearing Board of Pine Grove Township, 20 F. Supp. 2d 875, 878-80 (E.D. Pa. 1998), aff'd by, 181 F.3d 403 (3d Cir. 1999).  The Ninth Circuit has affirmed that an injunction is the proper remedy. Anacortes, 572 F.3d at 990, 998 (holding that "the

---

[5] The City argues that a wireless facility located at St. Bonaventure would provide service to a greater number of people than would CUMC, and that this alternative site would provide coverage to at least as many residences as CUMC would within the Heil/Edwards search ring.  The City's argument, however, is largely irrelevant.  Once a significant gap has been demonstrated, the issue is whether the alleged alternative will close that proven gap in coverage, not some other, alleged gap. See Anacortes, 572 F.3d at 995.  Therefore, that T-Mobile may have more than one significant gap in Huntington Beach is of no consequence.  Because T-Mobile has demonstrated that a significant gap exists in the area surrounding Heil Avenue and Edwards Street, and that CUMC is the least intrusive alternative to address that particular gap, T-Mobile is entitled to a permit.

City's denial of the application without showing the existence of some potentially available and technologically feasible alternative constituted an effective prohibition of services, which the district court properly enjoined").  See also T-Mobile West Corp. v. City of Agoura Hills, 2010 WL 53133981 at *11 (C.D. Cal. Dec. 20, 2011) (granting an injunction requiring issuance of the permits).

142.   In T-Mobile South LLC v. City of Milton, 2011 U.S. Dist. LEXIS 148, 686 (N.D. Ga. Dec. 28, 2011), the district court found that the city had violated 47 U.S.C. § 332(c)(7), but initially "remanded" the case to the city council.  On motion for reconsideration, the court held that its remand order was legal error and in its place issued an injunction requiring issuance of the permits:

> The Court agrees that to allow a remand is to encourage local governments to issue inadequate denials so that they will be able to continue to frustrate expediency by getting a second bite at the apple.  Remanding, even in a case such as this where there is some evidence of a legitimate denial-reason, is counter to Congress' clear mandate of expedient review and creates improper incentives.  Local governments are charged with following the TCA, and the courts are charged with making sure their process is proper.  See Preferred Sites, LLC [v. Troup County], 296 F.3d ([1210] at 1215-16 [(11th Cir. 2002)] ("By structuring the TCA in this manner, Congress explicitly preserved local zoning authority over the siting of wireless facilities, while permitting judicial oversight as to the manner which such decisions are made.")  And wireless providers should not have to come to the Court more than once per application.

2011 U.S. Dist. Lexis at **5-6.  See also T-Mobile Central, LLC v. Charter Township of West Bloomfield, 691 F.3d 794, 2012 WL 3570666 (6th Cir. Aug. 21, 2012) (affirming grant of an injunction).

143.   The Court therefore issues an injunction requiring the City to issue all necessary permits to T-Mobile to place, install, construct and operate wireless

/ / /

telecommunications facilities at CUMC, subject only to the conditions of approval issued by the Zoning Administrator.

144.   To the extent necessary, each of these conclusions of law may be deemed to be a finding of fact.

Dated:  October 10, 2012.

_____
CHRISTINA A. SNYDER
United States District Judge